IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JONI WESTAWSKI,
                           **Plaintiff,**

                  **v.**                                    **CIVIL ACTION**

                                                            **NO.  14-3239**
**MERCK & CO., INC.**
                           **Defendant.**

## OPINION

## I.  INTRODUCTION

Before the Court is Defendant Merck & Co., Inc.'s ("Merck") Motion to Dismiss for

Failure to State a Claim, ECF No. 7; the Plaintiff's Response in Opposition thereto, ECF No. 8;

and the Defendant's Reply, ECF No. 12.

For the reasons that follow, the Motion will be granted in part and denied in part.

## II.  FACTUAL HISTORY AND PROCEDURAL BACKGROUND

According to the Complaint, Plaintiff Joni Westawski began working for Defendant

Merck in 2001 as a pharmaceutical field sales representative and, after two promotions, was

offered a management-track position as a market research analyst in the Defendant's managed

care corporate headquarters, which she began in January 2009.  ECF No. 1 ¶¶ 8-9.  That August,

the Plaintiff was told by her supervisor, Bob Giannetti, that she would be assuming responsibility

for "an important new research project," known as a Positive Deviance study, which would

research managed care of diabetes in low-income Latino individuals.  *Id.* ¶¶ 11-14.  At the point

Mr. Giannetti approached the Plaintiff, the Managed Care Sales Team had already set aside a

budget of $250,000, selected an outside vendor (DrTango, Inc., an outside market research firm,

led for purposes of the study by executive vice president Dirk Schroeder), and determined the research study subjects (drawn from employee lists at H-E-B, a grocery store chain in Texas and Mexico and a major customer of Blue Cross Blue Shield of Texas). *Id.* ¶ 15.

Over the course of her work on this Positive Deviance study, the Plaintiff began to have concerns that it involved violations of both Merck internal policies as well as federal law. *Id.* ¶ 17. The Plaintiff continually brought her concerns to the attention of her supervisor, Mr. Giannetti. When the Plaintiff requested a meeting with another Merck manager who had worked with DrTango on a research study, Mr. Giannetti insisted he should be there. *Id.* ¶ 18. When the Plaintiff asked Mr. Giannetti why DrTango had been selected for this project when Merck contracting practices had not been followed, Mr. Giannetti told her DrTango had "specialized experience" in this type of market research and so those practices were, according to him, unnecessary. *Id.* ¶¶ 20-21. The Plaintiff later complained to Mr. Giannetti that the number of study subjects was too small compared to the amount of money Merck was spending on the study and that DrTango's "cost per interview" was too high; afterwards, DrTango agreed to add more individuals to the study. *Id.* ¶ 25. The Plaintiff attempted to keep DrTango to the deadline schedule originally agreed upon, but she would be overruled by Mr. Giannetti, who allowed DrTango to take as much time as Mr. Schroeder said was needed. *Id.* ¶¶ 31-32.

When the originally six-week study was completed over five months behind schedule, Mr. Schroeder told the Plaintiff that he wanted to publish the results of the study, even though DrTango's contract with the Defendant made clear that the study research was "proprietary and confidential" and thus publication would violate Merck internal policies and procedures. *Id.* ¶ 35. Mr. Giannetti instructed the Plaintiff to "come up with an addendum to the contract" with DrTango that would allow for further payment to Mr. Schroeder for speaking engagements in the

amount of $25,000 per engagement.  *Id.* ¶ 36.  When the Plaintiff met with another employee in the managed care department responsible for budgets, she learned that Pat Counihan, the vice president in charge of managed care, had authorized full payment for the Positive Deviance study to DrTango in January 2010, before work on the study was completed, inconsistent with the contract between the parties and with Merck policy.  *Id.* ¶ 38.

The Plaintiff was told that a new contract with DrTango would have to be created, as the original contract was considered "closed," and when she reported this to Mr. Giannetti, he allegedly responded, "You are pissing everyone off.  You need to pay Dirk Schroeder."  *Id.* ¶¶ 39-41.  The Plaintiff discussed the situation with some of her colleagues and became quite fearful when one of them said to her, "Whatever you do, don't make those payments.  If this ever gets audited, you're walking out of here in handcuffs."  *Id.* ¶¶ 42-43.

In April 2010, the Plaintiff and Mr. Giannetti received an email from a director of the managed care sales team which had designed the Positive Deviance study:  He explained in the email that high-level meetings were to be scheduled with Merck, DrTango, and senior leadership at H-E-B, and a similar presentation should be organized for members of the umbrella organization for Blue Cross Blue Shield of Texas.  *Id.* ¶¶ 44-45.  This message came in stark contrast to the Plaintiff's original expectation that this study would be presented internally to Merck executives.  *Id.* ¶ 45.  She realized that the DrTango project was not a pure market research study, but rather a mechanism through which H-E-B could help its employees achieve diabetes care compliance, thereby reducing workers' sick days; through which Blue Cross Blue Shield of Texas would see its costs go down; through which Merck would sell more pharmaceutical products; and through which Mr. Schroeder would be personally paid $25,000 per "speaking engagement" by involving himself in these meetings.  *Id.* ¶¶ 46-48.

After Mr. Giannetti refused to assist the Plaintiff in creating a "paper trail" for the $25,000 payments to Mr. Schroeder, the Plaintiff met with Mr. Giannetti and *his* supervisor, Camelot Ives, who informed the Plaintiff that she had "known [Vice President] Pat Counihan for 20 years.  If he says pay it, just pay it."  *Id.* ¶ 49.  In a separate meeting between the Plaintiff and Ms. Ives where the Plaintiff again raised concerns about the impropriety of these payments ordered to be made to Mr. Schroeder, Ms. Ives told the Plaintiff she was being "emotional" and that she should make the payments as directed, ultimately telling her, "Either do what I tell you to do or go work someplace else."  *Id.* ¶¶ 50-51.  She then told Mr. Giannetti "she was concerned she was being asked to do something that violated Merck policies and could violate federal law as well" and asked his permission to contact Merck's Business Practices and Compliance (BPC) department, but he declined.  *Id.* ¶ 52.  The Plaintiff also asked for permission to report her concerns to Brian Cain, vice president of market research, but again Mr. Giannetti refused to give it.  *Id.* ¶ 53.

When the Plaintiff spoke with a director in the speaking engagements department in June 2010 about creating the paper trail for these payments, he said to her, "Get your Kevlar vest ready, it's going to get ugly," telling her that Merck's BPC needed to be notified.  *Id.* ¶ 56.  As the Plaintiff was leaving to go on maternity leave, Merck launched an internal investigation into the DrTango project.  *Id.* ¶ 57.  Upon her return in February 2011, the Plaintiff was told that the internal investigation had resulted in no finding of wrongdoing except that Mr. Giannetti and Ms. Ives should have gone to the BPC department when the Plaintiff initially raised her concerns.  *Id.* ¶¶ 58-59.  After her return, Mr. Giannetti "repeatedly scolded" the Plaintiff, accusing her of being responsible for what had taken place and "for making his life difficult."  *Id.* ¶ 60.  Despite

this contentious relationship, Mr. Giannetti refused to support the Plaintiff's bid for a transfer to another department.  *Id.* ¶ 61.

The Plaintiff was finally transferred to a new market research team with a new supervisor, Praveen Advani, who "was known to be very friendly with Mr. Giannetti," after which she was allegedly "hassled and harassed in what was clearly an attempt to pressure her to leave the company."  *Id.* ¶¶ 62-63.  The Plaintiff was given no new work or assignments, or she was given excessive amounts of work with unreasonable deadlines, after which a co-worker on her team said that her new supervisor "is going to micromanage you until you leave the company."  *Id.* ¶¶ 64-65.

On June 26, 2012, the Plaintiff was informed that the market research department was being reorganized and that her position was being eliminated; she was told her termination was not for cause.  *Id.* ¶ 66.  The following day, the Plaintiff received an email with a new organizational chart, in which she saw that her position had not been eliminated and she had merely been replaced.  *Id.* ¶ 68.  The Plaintiff's final day at Merck was July 9, 2012.  *Id.* ¶ 4.

On October 15, 2012, in accordance with the procedures under the Sarbanes-Oxley Act, the Plaintiff timely filed a complaint with the Department of Labor, including the allegations regarding the DrTango project.  *Id.* ¶ 71.  After the requisite 180 days had passed, she filed her Complaint in this Court on June 6, 2014, alleging four counts against the Defendant:  a violation of the Sarbanes-Oxley Act, common law retaliation, common law wrongful discharge, and a violation of the Pennsylvania Whistleblower Act.

On August 11, 2014, the Defendant filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the Complaint fails to state a claim upon which relief could be

granted with respect to any of the four counts.  ECF No. 7-2 at 1.  The Motion has been fully briefed by the parties and is ripe for decision by the Court.

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556-57 (internal quotation marks omitted)).

"In light of *Twombly*, 'it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed conduct].'"  *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  "Context matters in notice pleading," and thus "some complaints will require at least some factual allegations to make out a 'showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Phillips*, 515 F.3d at 232 (quoting *Twombly*, 550 U.S. at 555).  Stating a claim "'requires a complaint with enough factual matter (taken as true) to suggest' the required element," calling for "'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  *Great Western*

*Mining*, 615 F.3d at 177 (quoting *Twombly*, 550 U.S. at 556).  "In other words, 'there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation.'"  *Id.* (quoting *Phillips*, 515 F.3d at 234-35).

In this Circuit, determining whether a complaint meets the pleading standard involves a three-step analysis: (1) "outline the elements a plaintiff must plead to state a claim for relief"; (2) "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth"; and (3) "look for well-pled factual allegations, assume their veracity, and then 'determine whether they plausibly rise to an entitlement to relief.'"  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679) (citations omitted).  At bottom, the question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, —, 131 S. Ct. 1289, 1297 (2011).

## IV.   DISCUSSION

### A.   *Sarbanes-Oxley (Count I)*

The Defendant moves to dismiss Count I of the Complaint—containing the Plaintiff's allegation that the Defendant violated Sarbanes-Oxley—arguing that it fails to state a claim upon which relief can be granted because it "fails to allege (1) that Plaintiff's supervisors were aware of her alleged protected activity or (2) the identity of those who made or were involved with the decision to eliminate her position."  ECF No. 7-2 at 6.  Because the Plaintiff has alleged sufficient facts to satisfy the contested element of the prima facie case under Sarbanes-Oxley, the motion to dismiss this Count is denied.

Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514(A), provides, in relevant part, that:

> [n]o company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee to provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

18 U.S.C. § 1514A(a)(1)(C) (2012) (internal section numbering omitted).  It is well established that courts should construe section 806 broadly.  *See, e.g.*, *Leshinsky v. Televent GIT, S.A.*, 942 F. Supp. 2d 432, 440-41 (S.D.N.Y. 2013).

To establish a prima facie case for a claim under Section 806 of Sarbanes-Oxley, the Plaintiff must allege that:

> (1) [she] "engaged in a protected activity"; (2) "[t]he respondent knew or suspected that the employee engaged in the protected activity"; (3) "[t]he employee suffered an adverse action"; and (4) "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action."

*Wiest v. Lynch*, 710 F.3d 121, 131 (3d Cir. 2013) (quoting 29 C.F.R. § 1980.104(e)(2)(i)–(iv)). The Defendant argues only that the Complaint fails to satisfy the second element—that it "knew or suspected that the employee engaged in the protected activity"—because the Plaintiff has not alleged the identity of relevant decisionmakers or their knowledge of her protected activity.  *See* ECF No. 7-2 at 6-9.

Few courts (and none in this Circuit) have addressed this element of the prima facie case in much depth in this context.  However, the extant weight of authority shows that when a plaintiff files a complaint alleging a Sarbanes-Oxley violation against *the corporation itself*, if she alleges facts that she engaged in protected activity directly to, at the very least, supervisors,

oversight committees, or the corporation itself, she satisfies this element for the purposes of withstanding a motion to dismiss.  *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1002-03 (9th Cir. 2009) (stating that one meeting with individuals who had undisputed "supervisory authority" over the plaintiffs suggesting a potential fraud on the shareholders sufficed to satisfy this element); *Stewart v. Doral Fin. Corp.*, 997 F. Supp. 2d 129, 138 (D.P.R. 2014) (denying motion to dismiss plaintiff's Sarbanes-Oxley whistleblower protection claims where a single letter sent by the plaintiff to the chairman of the defendant corporation's audit committee, standing alone, satisfied the second prong and "sufficed to show that the [defendant corporation] knew that [p]laintiff was engaging in protected activity"); *Johnson v. U.S. Bancorp*, No. 11-2010, 2012 WL 6615507, at *3 (W.D. Wash. Dec. 18, 2012) (holding that the allegation in the complaint that the defendant corporation knew of the protected activity was evidenced by a letter from OSHA regarding its intent to enter findings favorable to the plaintiff; defendants argued that the plaintiff's complaint was "missing . . . basic allegations detailing . . . the individuals involved, whether those individuals knew of the [plaintiff's] DOL SOX complaint, or when the communications occurred," and stating that "such detail is not required at this stage of the proceedings, [as] Rule 8(a) 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations" (quoting *Twombly*, 550 U.S. at 556)); *Guitron v. Wells Fargo Bank, N.A.*, No. 10-3461, 2012 WL 2708517, at *2-3, *15 (N.D. Cal. July 6, 2012) (complaints to supervisors were considered sufficient evidence).  On the other hand, the element is not satisfied if the corporation itself has no knowledge of the plaintiff's protected activity because the plaintiff has taken no steps to inform it of the activity.  *See, e.g.*, *Boyd v. Accuray, Inc.*, 873 F. Supp. 2d 1156, 1170-71 (N.D. Cal. 2012) (holding that the knowledge element was not satisfied where the plaintiff's only "protected activity" was his

outside complaint to the SEC of which the corporation was unaware; the plaintiff testified that he did not inform human resources about that complaint and stated, without support, only that "[c]learly, the persons involved in the decisionmaking process . . . were all made aware in one way or another of these complaints").

The Defendant posits that because the Plaintiff did not specifically allege that Mr. Advani, her new supervisor at the time of her discharge, or others in her new department had any knowledge of her protected activity, her claim must fail.  The Defendant cites as support *Wiest v. Lynch*, which states:

> If the undisputed facts establish that none of the . . . management officials involved in or responsible for the plaintiff's termination were aware of any of his alleged protected activity," the plaintiff cannot prevail. . . . It is one thing to say that a plaintiff's complaint may plead circumstantial grounds for inferring that a protected activity was a contributing factor, but the inferential chain may become too attenuated when the knowledge or identity of the decisionmaker is also left to inference, and all that the plaintiff can allege is knowledge of the protected activity on the part of certain higher-ups who may or may not have been involved in the adverse action (or, conversely, higher-ups who were involved in the adverse action but who had no knowledge of the protected activity).  Allegations are less adequate still when they name individuals who both may or may not have had knowledge and may or may not have had a decisionmaking role.

15 F. Supp. 3d 543, 566 (E.D. Pa. 2014).  Although the Defendant correctly restates the holding in *Wiest*, the Court declines to extend this holding to apply to the Defendant's situation in the way the Defendant wishes.

In *Wiest*, the plaintiff brought Sarbanes-Oxley whistleblower claims against both his employer, Tyco Electronics Corp., and four individual officer defendants, alleging discharge in retaliation for his making reports of suspected fraud and tax law violations.  On a motion to dismiss, the four individual defendants argued that their knowledge of the plaintiff's protected activities alone did not render them liable under the Sarbanes-Oxley whistleblower provision, stating that the plaintiff failed to allege that they were involved in the alleged adverse

employment action or that a causal connection existed between the plaintiff's protected activity and the adverse employment action taken by each named individual defendant. *Id.* at 565-68. The court found that the plaintiff's complaint was "simply too thin" with regard to three of the four individual defendants, and they were dismissed from the action. *Id.* at 566. The complaint contained allegations including that one individual was "personally involved in the potentially illegal activity that [the plaintiff] reported," that one individual "was in charge of and responsible for the actions of the business unit" he complained about, and that one individual "sign[ed] off on the expenses [the plaintiff] questioned." *Id.* at 565, 567. Such conclusory allegations were unsubstantiated and could not be accepted as true. *Id.*

At bottom, the Court reads *Wiest* to hold that a plaintiff cannot bring a Sarbanes-Oxley complaint against *individual defendants* if she cannot allege facts with reasonable particularity to the effect that the named individual defendant knew that she had engaged in protected activity. *Id.* at 566. In stark contrast to the factual situation in *Wiest*, here both the Complaint and the administrative charge below (attached as Exhibit B to the Defendant's Motion) are littered with mentions of individuals to whom the Plaintiff brought her concerns about the impropriety of the DrTango research study and of the content of those conversations. By the Court's count, the Plaintiff complained directly to at least eight Merck employees, including her own supervisor, her supervisor's supervisor, individuals in Merck's business practice and compliance department, human resources personnel, the company ombudsman, and two company vice presidents (including the vice president of market research). The Plaintiff has not, however, brought suit against these individuals. She has sued only Merck. And as Merck is the only named Defendant in this case, Merck is the only "person" Plaintiff must allege "knew or suspected that [she]

11

engaged in the protected activity" for the purposes of defeating this Motion.[1]  Considering the

number of Merck employees who were made aware of the Plaintiff's concerns by the Plaintiff

herself, it simply cannot be said at this stage in the proceedings that Merck *the corporation*, the

only defendant, was unaware of the Plaintiff's protected activity, and the Court will not hold

otherwise.

The Defendant's argument that the Plaintiff's entire claim should be dismissed because a

single individual who happened to be the Plaintiff's immediate supervisor when she was

discharged was allegedly unaware of her prior protected activity is not supported by the authority

on which it relies, which, furthermore, given its provenance, has no precedential force here.  To

clarify, *Bury v. Force Protection, Inc.* involved a motion to dismiss two individual defendants

whom the plaintiff did not sufficiently allege were aware of his protected activity, instead asking

the court to "infer" their awareness.  No. 09-1708, 2011 WL 2935916, at *1-2 (D.S.C. R & R

June 27, 2011), *adopted*, 2011 WL 2929827 (D.S.C. July 19, 2011)).  *Jordan v. Sprint Nextel

Corp.* similarly involved dismissing an individual defendant after the plaintiff made no allegations

in the complaint that the defendant *personally* undertook any actions against the plaintiff.  3 F.

Supp. 3d 917, 932 (D. Kan. 2014).  *Frederickson v. Home Depot U.S.A., Inc.*, although

dismissing a corporate defendant, involved a plaintiff who alleged his "protected activity" was a

conversation the complainant had with the supervisor of the service department in which he

stated that he refused to mark down store-used items as "damaged goods," because he believed it

to be "illegal" and "fraudulent," but was in fact found not to be protected activity at all.  Arb. No.

07-100, 2010 WL 2158225, at *5 (Dep't of Labor May 27, 2010).  The passage from *Leshinsky*

---

[1]  29 C.F.R. § 1980.100 *et seq.*, the regulations governing procedures for handling retaliation complaints under
section 806 of Sarbanes-Oxley, define "Respondent" as "the person named in the complaint who is alleged to
have violated the Act" and define "Person" was "one or more individuals, partnerships, associations, companies,
corporations, business trusts, legal representatives or any group of persons."  *Id.* § 1980.101(j)–(k).

*v. Televent GIT, S.A.* upon which the Defendant relies is inapposite, as it explicitly refers to the

*causation* prong of the prima facie standard, not the knowledge prong at issue here.  *See* 942 F.

Supp. 2d at 451-52.  *Feldman v. Law Enforcement Associates Corp.* does not apply to the facts

of this case because the plaintiff's only potentially protected activity there were complaints made

to a *subordinate* of the plaintiff, and the text of Sarbanes-Oxley clearly mandates that the

complaint must be made to "a person with supervisory authority" over them.  955 F. Supp. 2d

528 (E.D.N.C. 2013); 18 U.S.C. § 1514(a)(1)(C).  And finally, *Klopfenstein v. PCC Flow*

*Technologies Holdings, Inc.*, affirmed the dismissal of only an individual defendant who was not

a decisionmaker in the complainant's termination, and—consistent with the Court's position

here—concluded that the corporate defendant *was* a proper respondent in the matter.  ARB Nos.

07-021 & 07-022, 2009 WL 2844805, at *6-8 (Dep't of Labor Aug. 31, 2009).

Because the facts as alleged in the Complaint show that Merck, through its employees,

was aware of the Plaintiff's protected activity, her Sarbanes-Oxley claim is "sufficient to cross

the federal court's threshold."  *Skinner v. Switzer*, 131 S. Ct. at 1297.  Thus, the Defendant's

motion to dismiss the Sarbanes-Oxley claim in Count I is denied.[2]

## B.   *Common Law Retaliation (Count II)*

The Defendant next moves to dismiss Count II of the Plaintiff's Complaint, alleging

common law retaliation, arguing that "Pennsylvania does not recognize such a cause of action."

ECF No. 7-2 at 9 (citing *Prater v. City of Philadelphia*, No. 11-1618, 2012 WL 5464967, at *6

(E.D. Pa. Nov. 8, 2012) ("[W]e are aware of no Pennsylvania common law cause of action or

---

[2]   The Court declines to address the Defendant's second contention—that the Plaintiff's claim should be dismissed
because the Complaint "fails to allege who was involved in the decision to eliminate Plaintiff's position."  ECF
No. 7-2 at 8.  The Defendant cites to no case law in support of this assertion and the Court will not entertain a
dismissal of the entire Sarbanes-Oxley claim based on a single unsupported sentence.  *See United States v. Benish*,
5 F.3d 20, 26 (3d Cir. 1993) (rejecting a party's claim where the party "provid[ed] no legal support for his
argument or any persuasive reason" for the court to find in his favor).  Regardless, this is not an element of the
prima facie case.

'retaliation' outside of a claim for wrongful discharge in the employment context."), *aff'd in part, vacated in part on other grounds*, 542 F. App'x 135 (3d Cir. 2013)).  The Court agrees with the Defendant.  Although the Plaintiff in her Opposition argued that the claim should be permitted because it is made *within* the employment context, the Plaintiff likely misreads the precedent.  Retaliation does not exist as a separate cause of action in Pennsylvania, *see Shick v. Shirey*, 716 A.2d 1231 (Pa. 1998) (discussing retaliation in the context of a wrongful discharge claim), and the Court is not inclined to create a separate cause of action where the Pennsylvania courts have not done so.

Accordingly, the Defendant's motion to dismiss the retaliation claim in Court II will be granted.

### C.    *Wrongful Discharge (Count III)*

The Defendant next moves to dismiss Count III of the Complaint, alleging a wrongful discharge claim, arguing that the Complaint fails to state a claim because she was an at-will employee at Merck and her situation does not fall into any of the exceptions to the general rule barring wrongful discharge claims stemming from the termination of an at-will employment relationship.  ECF No. 7-2 at 10-12.  The Plaintiff responds that her claim falls under the public policy exception to this rule, first, because she alleges that Merck was requiring her to commit a crime and, second, because Sarbanes-Oxley and the Pennsylvania Whistleblower Law prohibit the Defendant from discharging her.  ECF No. 8-1 at 6-7.

"Pennsylvania adheres to the at-will employment doctrine, which recognizes that 'an at-will employee may be terminated for good reason, bad reason, or no reason at all.'"  *Murray v. Gencorp, Inc.*, 979 F. Supp. 1045, 1047 (E.D. Pa. 1997) (quoting *Krajsa v. Keypunch, Inc.*, 266 A.2d 355, 358 (Pa. Super. Ct. 1993)).  No common law cause of action exists for wrongful

discharge of an at-will employee except in narrow circumstances were "dicharges of at-will employees would threaten clear mandates of public policy." *Clay v. Advanced Computer Applications*, 559 A.2d 917, 918 (Pa. 1989) (citing *Geary v. U.S. Steel Corp.*, 319 A.2d 174 (Pa. 1974)); *see also*, *e.g.*, *Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910 (3d Cir. 1982); *Paul v. Lankenau Hosp.*, 569 A.2d 346 (Pa. 1990).  The public policy exception may be applied only "under narrowly limited circumstances where (1) an employer requires an employee to commit a crime, (2) an employer prevents an employee from complying with a statutory duty, or (3) a statute prohibits discharge." *Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571, 577 (Pa. Super. Ct. 1999).  In her Opposition, the Plaintiff argues that her case falls under the first and third of these exceptions.  The Court notes before beginning its analysis that the Pennsylvania Supreme Court has made clear that "an employee will be entitled to bring a cause of action for termination of th[e] relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth." *McLaughlin v. Gastrointestinal Specialists*, 750 A.2d 283, 287 (Pa. 2000).[3]

### 1.   Whether the Defendant Required the Plaintiff to Commit a Crime

In reviewing the landscape of cases discussing the crime exception, the Court is constrained to find any decision where a plaintiff's allegations even closely approximating those made by the Plaintiff here justify bringing her claim under the umbrella of the public policy

---

[3]  To shed light on how "limited" the circumstances must be to justify sustaining an at-will employee's wrongful discharge claim, in *Clark v. Modern Group, Ltd.*, 9 F.3d 321 (3d Cir. 1993), the Third Circuit noted that, at that time, only *three* reported Pennsylvania cases had ever granted relief from wrongful discharge under this exception, "and in each there was either an infringement of constitutional rights or an actual violation of the text or plain legislative intent of a statute designed to protect the public from serious harm," *id.*, such as in *Field v. Philadelphia Electric Co.*, 565 A.2d 1170 (Pa. Super. Ct. 1989), where the employee, hired as an expert in nuclear safety, was discharged for making a statutorily required report to the Nuclear Regulatory Commission, or in *Hunter v. Port Authority*, 419 A.2d 631 (Pa. 1980), where a pardoned individual was denied employment because of an assault conviction, which had no relevance to his fitness for the job, in violation of Article I, Section 1 of the Pennsylvania Constitution which was interpreted to guarantee an individual's right to engage in any of the common occupations.  The Pennsylvania Supreme Court more recently reaffirmed that exceptions to the general rule barring wrongful discharge claims should be recognized "in only the most limited of circumstances." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009).

exception.  The relevant portions of the Complaint related to whether the Defendant required the

Plaintiff to commit a crime, as reprinted in the Opposition, state:

> 83.    Defendant wrongfully terminated Plaintiff Joni Westawski.
>
> 84.    Plaintiff raised valid concerns, based on reasonable beliefs about the
> company's practices regarding the DrTango research project and that these
> practices could violate internal company policies and rules, as well as
> federal law.
>
> 85.    Defendants' decision to terminate her employment was unlawful and
> without proper cause or justification.

ECF No. 8-1 at 6 (citing ECF No. 1 ¶¶ 83-85).  Looking past the allegations in paragraphs 83

and 85, which are both conclusory and inadequate under *Twombly* and *Iqbal*, the Plaintiff's exact

justification in paragraph 84—that her "reasonable belief" that the DrTango project could violate

internal policies and federal law—was disallowed by the Third Circuit in *Clark v. Modern*

*Group, Ltd.*  In that decision, the court wrote:

> The creation of a cause of action based on an employee's reasonable belief about the
> law would leave a private employer free to act only at the sufferance of its employees
> whenever reasonable men or women can differ about the meaning or application
> of a law governing the action the employer proposes.  The effect such a rule might
> have on corporate governance and the efficient operation of private business
> organizations is not insignificant.  On reason and authority, we therefore conclude
> that a clear violation of public policy depends on an actual violation of law.

9 F.3d 321, 332 (3d Cir. 1993).  The court cited *Levito v. Hussman Food Service Co. Victory*

*Refrigeration Division*, No. 89-5967, 1990 WL 1426 (E.D. Pa. Jan. 8, 1990), in which the

plaintiff's wrongful discharge claim—that his employer terminated him for refusing to engage in

an act that would have resulted in an illegal kickback under 18 Pa. Cons. Stat. § 4108—survived

a motion to dismiss "not because the plaintiff had a reasonable belief in the illegality of the

conduct the employer proposed, but because the employee's evidence, if believed, would have

shown he was terminated for refusal to engage in an illegal activity."  *Clark*, 9 F.3d at 331.

The Plaintiff here has not adduced sufficient factual allegations in her Complaint to rise to this level, stating merely in her Opposition that "Defendant Merck acknowledges that the public policy exception applies when an employee is being required to commit a crime.  That was the case here, as the facts of the Complaint clearly allege."  ECF 8-1 at 7.  Contrary to the Plaintiff's assertion, the Complaint is not so "clear," as it fails to include mention of the violation of any specific statute, as the *Levito* plaintiff did in successfully defending against a motion to dismiss and as courts allowing claims to proceed under this exception have required.  *See Natale v. Winthrop Res. Corp.*, No. 07-4686, 2008 WL 2758238, at *12 n. 7 (E.D. Pa. July 9, 2008) (collecting cases).  In that regard, her claim is more akin to the wrongful discharge claim in *McGonagle v. Union Fidelity Corp.*, 556 A.2d 878 (Pa. Super. Ct. 1989), which the Pennsylvania Superior Court rejected because the plaintiff had alleged no specific statutory violation.  As the Third Circuit interpreted that case, "[t]he superior court concerned itself only with the question of actual violation," not the reasonableness of the plaintiff's belief.  *Clark*, 9 F.3d at 329.

The Plaintiff cites many alleged violations of Merck internal policies and procedures, but "[w]hether another employee's action which is 'internally illegal,' *i.e.* a violation of company policy or standards, can constitute the actual illegal conduct necessary to satisfy *Clark* is dubious."  *Whitney v. Xerox Corp.*, No. 94-3852, 1905 [sic] WL 1632 (E.D. Pa. Sept. 29, 1995).  Regardless, even if the Court were to construe the facts the Plaintiff recounted as criminal fraud, "[c]onclusory allegations of criminality are patently insufficient" to state a claim under the public policy exception."  *Stoneback v. ArtsQuest*, No. 12-3286, 2012 WL 49636524, at *3, *11 (E.D. Pa. Oct. 17, 2012).  A plaintiff *must* "identify the specific statutes or regulations he or she was asked to violate."  *Urban v. Walgreen Co.*, No. 14-1798, 2014 WL 7232240, at *4 (E.D. Pa.

Dec. 18, 2014).  The Plaintiff here has not done so; she is thus not entitled to the protection of the exception on this ground.

### 2.      Whether Sarbanes-Oxley Prohibits Discharge

Turning now to the Plaintiff's second argument against dismissal of her wrongful discharge claim, that it should survive a motion to dismiss because a statute or statutes prohibited her discharge.  At the outset, the Court agrees with the Defendant that the Pennsylvania Supreme Court's decision in *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 289 (Pa. 2000), forecloses use of Sarbanes-Oxley to support her contention that the public policy exception should apply to her because the statute prohibits her discharge:  The Pennsylvania high court there admonished that "it is a mistake to baldly point to a federal statute or administrative regulation and, without more, proclaim this as the public policy of the Commonwealth, such that every violation of any federal code or statute becomes the basis for seeking a common law remedy against an employer."  *See also id.* at 318-19 (citing *Holmes v. Schneider Power Corp.*, 628 F. Supp. 937, 940 (W.D. Pa.) (rejecting the argument that a state common law claim for wrongful discharge could be made by simply relying upon OSHA, stating that "because OSHA is a federal law, we do not believe that this legislative scheme in itself provides any indication of a *Pennsylvania* state policy" (emphasis added)), *aff'd*, 806 F.2d 252 (3d Cir. 1986) (further citation omitted)).

### 3.      Whether the Pennsylvania Whistleblower Law Prohibits Discharge

The Plaintiff contends that the Pennsylvania Whistleblower Law also operates to allow her wrongful discharge claim to proceed under the public policy exception.  The Whistleblower Law makes it unlawful for an employer to:

> discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, locations or privileges of employment because the employee or a person acting on behalf of the

employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 Pa. Cons. Stat. § 1423(a). An "employer" is defined in the statute as a "person supervising one or more employees, including the employee in question; a superior of that supervisor; or an agent of a public body." *Id.* § 1422. A "public body" includes a "body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body." *Id.* The parties' briefs include lengthy discussions interpreting this definition. The discussions reflect the fact that this District's courts and the Superior Court of Pennsylvania have gone back and forth about what constitutes a "public body": in particular, whether receipt of Medicaid funds and/or direct appropriations from the legislature operates to render an organization a "public body" for purposes of alleging liability under the Whistleblower Law. *See Cohen v. Salick Health Care, Inc.*, 772 F. Supp. 1521, 1526 (E.D. Pa. 1991) (holding that "the language 'funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body' was intended by the legislature to be limited to monies which were appropriated by the legislature for the purpose of aiding 'public bodies' in pursuit of their public goals" and ruling that receipt of Medicaid funds does not transform an entity into a "public body"); *Riggio v. Burns*, 711 A.2d 497, 499-500 (Pa. Super. Ct. 1999) (en banc) (holding that "the statute plainly and unequivocally makes any body 'funded in any amount by or through the Commonwealth . . . authority' a public body for the purposes of the Whistleblower Law" but declining to rule on the Medicaid question); *Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571, 577 (Pa. Super. Ct. 1999) (rejecting *Cohen* and holding that "plain meaning of the language of the statute makes it clear that it was intended to apply to all agencies that receive public monies under the administration of the Commonwealth," including those receiving

Medicaid funds); *Tanay v. Encore Healthcare LLC*, 810 F. Supp. 2d 734, 743 (E.D. Pa. 2011) (rejecting *Denton* and reaffirming *Cohen*, holding that "the receipt of Medicaid reimbursements is insufficient to make an otherwise private entity a public body subject to Whistleblower Law liability").

It is premature, however, for this Court to enter the fray on the question of whether Merck is or is not a "public body," given the state of the proceedings here.  In her Opposition, the Plaintiff contends that Merck "has received millions of dollars from Pennsylvania in the form of research and development tax credits over the years," "receives payment for vaccines . . . through state support of the Vaccine for Children Program," and "receives state support for sale of prescription pharmaceuticals to the elderly through programs such as the Pharmaceutical Assistance Contract for the Elderly (PACE)."  ECF No. 8-1 at 9 & n.1.  However, none of this is found in the Complaint, which includes a sole reference to public funding allegedly received by the Defendant:  "Defendant Merck qualifies as a 'public employer' for purposes of the Pennsylvania Whistleblower Act because Defendant receives a substantial amount of public funds, both state and federal."  ECF No. 1 ¶ 91.  This single allegation is a conclusion not entitled to the assumption of truth under *Twombly* and *Iqbal*.  *See Great Western Mining*, 615 F.3d at 177.   And, even if the allegation were entitled to such an assumption, it is deficient as a basis to support Count III, given that it is pleaded under Count IV and is not included by way of incorporation into Count III.

Accordingly, the Defendant's motion to dismiss Count III will be granted without prejudice, and the Plaintiff will be given leave to amend the Complaint to plead sufficient factual allegations.

### D.   *Pennsylvania Whistleblower Law (Count IV)*

Finally, the Defendant argues in its Motion that Count IV should be dismissed because, similar to its argument under Count III, Merck is not a "public body" under the correct reading of the Whistleblower Law.  ECF 7-2 at 12.  The Defendant also argues—only on Reply—that Count IV of the Complaint should be dismissed because the Plaintiff's Whistleblower Law claim is time-barred, arguing that such claims must be filed within 180 days after the occurrence of the alleged violation.  ECF No. 12 at 5-6.

Looking to the Defendant's second argument first, a reply brief "is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues." *United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006).  If a moving party declines to raise arguments until reply briefing, "the Court need not address them." *Filer v. Foster Wheeler LLC*, 994 F. Supp. 2d 679, 692 (E.D. Pa. 2014); *see also Stump v. Gates,* 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief . . . . The reasons are obvious.  It robs the [nonmoving party] of the opportunity to demonstrate that the record does not support [a moving party's] factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result."); *Pub. Citizen Health Research Grp. v. NIH*, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) ("The Court highly disfavors parties creating new arguments at the reply stage that were not fully briefed . . . . By placing a new argument in the Reply, [the moving party] does not permit [the nonmoving party] to competently respond to such an argument").  Because the Plaintiff has been denied an opportunity to respond to the new argument raised in the Defendant's reply regarding timeliness, this Court will not consider it in ruling on the pending

motion to dismiss.  *See D'Aiuto v. City of Jersey City*, No. 06-6222, 2007 WL 2306791, at *4 n.1 (D.N.J. Aug. 8, 2007).

As to the Defendant's first argument, the Court previously addressed the parties' substantive Whistleblower Law arguments in subsection IV.C.3, *supra*, and reiterates here its reasoning and direction.  The motion to dismiss the Pennsylvania Whistleblower Law claim in Count IV is granted without prejudice and with leave to amend.

An appropriate Order follows.


Dated:  **February 3, 2015**


                                        **BY THE COURT:**

                                        **/S/ WENDY BEETLESTONE, J.**

                                        _____

                                        **WENDY BEETLESTONE, J.**