— FOR PUBLICATION —

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JONI WESTAWSKI,** | |
| **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO. 14-3239** |
| **MERCK & CO.** | |
| **Defendants.** | |

## OPINION

### I.      INTRODUCTION

Plaintiff Joni Westawski claims that her former employer, Defendant Merck & Co., Inc. ("Merck"), discharged her in retaliation for reporting suspected fraud pertaining to a research project involving an outside market research firm, DrTango, Inc. ("DrTango"). On May 3, 2016, Merck filed a Motion for Summary Judgment on the Plaintiff's Sarbanes-Oxley and wrongful discharge claims. At oral argument on the instant Motion, the Plaintiff represented that she is withdrawing her claim for common law wrongful discharge and proceeding only on the Sarbanes-Oxley retaliation claim. The remaining issue, therefore, is whether Merck is entitled to summary judgment on Plaintiff's claim under Section 806 of the Sarbanes-Oxley Act.

### II.      FACTUAL BACKGROUND

Merck is a publically traded global healthcare company that delivers health solutions through its prescription medicines, vaccines, biologic therapies, and animal health products. Defendant's Reply Statement of Undisputed Material Facts ("Def. R. Facts") ¶ 1. Plaintiff Joni Westawski began her career at Merck in 2001 as a Pharmaceutical Sales Representative. Def. R. Facts ¶ 6; Plaintiff's Statement of Disputed Material Facts ("Pl. Facts") at 1; Joint Appendix

("JA") 300-01. In early 2009, the Plaintiff moved into the role of Market Research Analyst, reporting to Bob Giannetti, a director in the Market Research group. Def. R. Facts ¶ 6; Pl. Facts at 1; JA 90-91, 211-12, 419. During her time as a Market Research Analyst, the Plaintiff's performance was solid. Def. R. Facts ¶ 8; Pl. Facts at 1; JA 96, 130-31. Her performance generally fell within the middle of the distribution, relative to her peers. Def. R. Facts ¶ 8; Pl. Facts at 1; JA 92-95, 130-31, 416-20, 583, 604.

    A.  <u>DrTango Project</u>

In mid-2009, the Plaintiff was assigned to work on her first major market research study (the "Project" or "Study"). Def. R. Facts ¶ 10; Pl. Facts at 2; JA 38, 110, 213, 283, 506. The Project sought to examine the Hispanic workforce of H-E-B ("HEB"), a large grocery store chain operating in Texas and Mexico (Def. R. Facts ¶ 11; JA 43-44, 396-97), in order to identify ways to control and reduce the incidence of diabetes and pre-diabetes in that population by engaging HEB employees in appropriate diabetes management programs. Def. R. Facts ¶ 11; Pl. Facts at 2; JA 175, 180-81, 183-5, 396-97, 408-10. HEB was seeking to control the costs associated with diabetes in its employee population. Def. R. Facts ¶ 14; JA 161, 184-85. HEB had contracted with a third-party benefits and claims administrator, Blue Cross Blue Shield of Texas ("BCBS"), to provide HEB employees with diabetes and other wellness programs. Def. R. Facts ¶¶ 14, 16; JA 184-85. BCBS sought to help identify effective disease management programs so that both BCBS and HEB could manage these costs. Def. R. Facts ¶ 16; JA 185-87.

An outside market research firm, DrTango, Inc. ("DrTango"), was selected to carry out the Project. The parties disagree as to how and why DrTango was retained.

Merck maintains that the idea for the Project originated with HEB. Def. R. Facts ¶ 14; JA 160-65. According to Merck, HEB's benefits consultant called a meeting with representatives

from HEB and BCBS, to which Dr. Dirk Schroeder, Executive Vice President of DrTango, was invited due to his expertise in Hispanic health issues. Def. R. Facts ¶ 16; JA 175. Merck maintains that in connection with that meeting, Dr. Schroeder concluded that HEB's difficulty in controlling the costs associated with diabetes in its Hispanic employee population presented a perfect opportunity for the application of "positive deviance," a research methodology with which he had significant prior experience. Def. R. Facts ¶ 17; JA 176. As a methodology, positive deviance seeks to address problems by quantitatively examining how individuals in the afflicted population successfully manage their illness. Def. R. Facts ¶ 17; JA 178-79, 396-97. According to Merck, HEB engaged DrTango to employ positive deviance to gain insights into: (i) how HEB's diabetic Hispanic employees who successfully managed their diabetes were able to do so; and, (ii) how HEB's "prediabetic" Hispanic employees—namely, those at risk of diabetes—were able to prevent themselves from developing the condition. Def. R. Facts ¶ 19, JA 180-81, 408-10. Having identified these behaviors through employee interviews and data analysis, DrTango would then develop programming to educate employees who were not successfully managing or preventing diabetes. Def. R. Facts ¶ 20; JA 180-81, 408-10. Merck maintains that DrTango prepared a proposal to this effect. Def. R. Facts ¶ 21; JA 176. According to Merck, DrTango considered a number of potential partners to help fund the Project before recommending that HEB approach Merck. Def. R. Facts ¶ 21, JA 176-77, 187-88, 440. Merck asserts that HEB first proposed the Project to Victoria Stumpf, Merck's Director for the Southeast, in December 2007. Def. R. Facts ¶ 22; JA 160, 440. In May 2008, Ms. Stumpf passed the opportunity on to Dee Parke, a Corporate Account Executive in Merck's Managed Care division. Def. R. Facts ¶ 22; JA 160-64. According to Merck, the goal of the Study was to help

HEB increase its employees' adherence to healthcare programs, thereby reducing its healthcare costs. Def. R. Facts ¶ 25-27.

The Plaintiff asserts, by contrast, that HEB did not approach Merck about working with DrTango. Pl. Facts at 2. Rather, it was Merck's accounts team that identified and retained DrTango with the objective of utilizing DrTango's contacts to help Merck gain access to BCBS executives. *Id*. at 2-3. According to the Plaintiff, Merck's senior sales staff were "desperately seeking entry points" to the BCBS pharmacy group in 2009—specifically to Tom Tran, the head of that group, and Eduardo Sanchez, the chief medical officer at BCBS—in order to advance the position of Merck's products on the BCBS formulary list, thereby increasing their sales. *Id*. The Plaintiff maintains that Merck account executives Tim Duffey and Blake Hennington identified DrTango and its Vice-President, Dr. Schroeder, as such an entry point. *Id*. at 2; ECF No. 60-2 at 12. According to the Plaintiff, Merck engaged DrTango to leverage Dr. Schroeder's relationships with large managed care organizations ("MCOs"), including BCBS, to the benefit of Merck's sales team. Pl. Facts at 2-3; ECF No. 60-2 at 9-12. In sum, the Plaintiff contends that DrTango was not engaged to carry out a legitimate market research study, but "was instead exchanging access to BCBS of Texas for money." ECF No. 60-2 at 12. Merck maintains that DrTango was selected as the vendor for the Project because of its expertise with Hispanic populations and the positive deviance methodology. Def. R. Facts ¶ 33.

The Plaintiff was responsible for developing and overseeing the Project under the supervision of her manager, Bob Giannetti. Def. R. Facts ¶ 13; JA 110. The Plaintiff and Mr. Giannetti helped to finalize the details of the Project, which were ultimately memorialized in a contract that governed the scope of the Project: the Project Plan Addendum ("PPA"). Defendant's Statement of Undisputed Material Facts ("Def. Facts") ¶ 40; JA 405-15. Throughout

the winter of 2009 and the early spring of 2010, the Plaintiff and Mr. Giannetti worked with DrTango to manage the Project and to produce a final report for delivery to internal Merck stakeholders. Def. Facts ¶ 42.

Over the course of the Project, the Plaintiff raised a number of concerns with regard to irregularities that she believed indicated contraventions of Merck's internal controls.

In mid-2009, at the outset of the DrTango Project, the Plaintiff voiced concerns over what she perceived to be a violation of Merck's vendor selection process. Merck's market research guidelines required that projects calling for non-preferred vendors go through a request for proposal ("RFP") process. Def. R. Facts ¶ 34; Pl. Facts at 4-5; JA 216-17, 219. It is undisputed that despite DrTango being a non-preferred vendor, the RFP process was not completed for the Project. *Id*. When the Plaintiff suggested to Mr. Giannetti that an RFP was required (JA 503; Pl. Facts at 5), he responded that there was no need to utilize the RFP process due to an exception for vendors with unique expertise. Pl. Facts at 5; Def. R. Facts ¶ 35; JA 503, 510. Merck maintains that DrTango's unique expertise with both the Hispanic population and the positive deviance methodology justified this exception to the RFP process. Def. R. Facts ¶ 34; JA 574-76.

Around the same time, the Plaintiff raised concerns that the initial costs proposed by DrTango to conduct the Project were too high. The original cost was estimated at $200,000, to be funded by Merck's Global Customer Insights Department. Pl. Facts at 5; JA 397, 505, 511. This would cover 20 to 24 individual interviews ("IDIs") with HEB employees, as well as four to six focus groups. JA 396. The Plaintiff expressed concerns, both contemporaneously to Mr. Giannetti and later to Merck's Business Practices and Compliance Division ("BP&C"), that the Project cost had been driven up by high Cost-Per-Interview ("CPI") pricing that exceeded Merck's internal protocols. Pl. Facts at 5; Def. R. Facts ¶ 37, 39; JA 121-22, 505, 511.

Specifically, the Plaintiff notified Mr. Giannetti that DrTango's CPI was nearly twice what was allowable under Merck's guidelines, and suggested that the number of study subjects was too small in view of the amount of money Merck was spending on the Project. Pl. Facts at 5; JA 505, 511. According to the Plaintiff, Mr. Giannetti responded to her concerns by simply suggesting that DrTango increase the number of in-person interviews to 78, thereby bringing the total cost more in line with Merck's CPI guidelines. Pl. Facts at 5; SA 23-24. Following price negotiations in September 2009, DrTango did increase the number of interviews from 30 to 78, and also reduced its costs. JA 398-99; Supplemental Appendix ("SA") 23. Despite the CPI and overall cost reduction, the Plaintiff still felt that the Project pricing was unreasonable. JA 398, 511. During Merck's internal investigation into the DrTango Project in 2010, Mr. Giannetti explained that he believed increasing the number of interviews was necessary to the integrity of the Project data. JA 554, 556. This is disputed by the Plaintiff, who alleges that increasing the number of interviews did not strengthen the Study's reliability. Pl. Facts at 5-6; SA 23-24.

DrTango proceeded to carry out the positive deviance research on diabetic and prediabetic HEB employees from September 2009 to early 2010. The Plaintiff expressed concern that the Project fell behind schedule as a result of Mr. Giannetti repeatedly acquiescing to Dr. Schroeder's requests for extensions. Def. R. Facts ¶ 43; JA 508-09. Merck does not dispute that the Project deadlines were pushed back several times. In August 2009, before the positive deviance research was underway, the Study was projected to conclude in December 2009. JA 397, 555. In the PPA governing the Project, however, the date for delivery of the final report was listed as January 15, 2010. JA 407, 421, 424. Once DrTango started conducting the research, that deadline was extended twice: first to January 29, 2010, and subsequently to February 10, 2010.

6

JA 421, 424. On February 10, 2010, DrTango submitted its report on the research results to

Merck. ECF No. 60-2 at 17; JA 422-23.

      After reviewing the report, however, the Plaintiff and Mr. Giannetti both expressed

serious concerns about its quality. ECF No. 60-2 at 17; JA 421; SA 103-05. Specifically, the

Plaintiff raised questions with DrTango staff regarding missing data, anomalies in the data set,

and the inclusion of certain individuals as research subjects who did not meet the inclusion

criteria. JA 122-23, 427-28; SA 25-28, 31-39, 102-05.

      On February 18, 2010, a week after DrTango submitted the report, Mr. Giannetti sent an

e-mail to a number of Merck colleagues entitled, "Status of the DrTango Project." JA 421. In it,

Mr. Giannetti complained that it was "glaringly obvious to [the Plaintiff] and I that the quality of

the deliverable is sub-par and requires significant re-work." *Id*. He added:

> "This set-back is one of many in a long line of disappointments in working so far
> with DrTango . . . . [W]e frequently ran into problems related to recruiting,
> analysis, confidentiality, and overall timeline throughout the project. At each step,
> however, we were ensured corrective action was taken by Dr. Tango and the
> overall quality of the results was not compromised. Most recently, we allowed an
> additional 4 weeks for them to finalize the research findings/recommendations in
> an attempt to ensure we would receive quality work. As it stands today, their
> output is NOT quality work and I would NOT put their work in its current form in
> front of anyone on this team . . . . I remain cautiously optimistic that this research
> will deliver content that is meaningful and actionable to Merck, however it will
> not be without additional time and effort from Dr. Tango and oversight from the
> Merck GCI team."

JA 421.

      Between February 18 and February 25, 2010, the Plaintiff and Mr. Giannetti discussed

their concerns about the research findings with the DrTango team, and asked them to provide the

missing data. JA 122-23, 421-25; SA 103-05. Dr. Schroeder explained the reasons for the

limitations of the data, SA 103-05, and agreed to provide a revised version of the report on

February 26, 2010, which he did. JA 421-26. After reviewing the second draft, the Plaintiff and

Mr. Giannetti proposed a number of additional edits, which were implemented by the DrTango team. JA 426-28, 304-05. On March 2, 2010, Mr. Giannetti emailed Dr. Schroeder and his colleagues at Merck, thanking Schroeder for the revised version of the report and declaring that "we should be good to go." JA 304. That same day, the Plaintiff circulated a copy of DrTango's final report and slide deck to the Merck team.  JA 429-30. The following day, Dr. Schroeder presented the results of the research to around 30 members of Merck staff. JA 429, 509.

According to the Plaintiff, her colleagues at Merck were unimpressed with the results of the positive deviance research. Pl. Facts at 6; JA 434-35. Nevertheless, her work on the Study was praised by her supervisors: on October 14, 2009, she received an award "[i]n recognition of [her] exceptional leadership in the development and execution of a key research project that will enhance our understanding of cultural disparities." JA 302-03. After the Project's conclusion, she received another award on April 22, 2010 "[i]n recognition of [her] tireless efforts to ensure the success of the Dr Tango research project." JA 306. Additionally, the Plaintiff's 2010 mid-year performance review was positive overall, JA 308, and her year-end performance plan described the DrTango Project as her "major accomplishment in 2010." JA 267-69, 583-85.

The PPA governing the Project did not provide that Merck would pay DrTango for presentations of the research results to Merck customers. Def. R. Facts ¶ 48; JA 405-15. However, after Dr. Schroeder presented the results of the Study to Merck staff in March 2010, DrTango agreed to conduct similar presentations to HEB and BCBS (the "Presentations"). Def. R. Facts ¶ 49; JA 50, 458.  During April and May 2010, the Plaintiff prepared the slide decks for the Presentations and obtained internal legal approval for their external use. JA 439, 449-52, 467-68. DrTango presented the research findings to HEB and BCBS in May 2010. JA 465. Merck contends that HEB and BCBS were both impressed by the research findings, and that

HEB applied for funding from the Robert Wood Johnson Foundation to trial the research in 300 HEB stores. Def. R. Facts at ¶ 52; JA 198-200.

The Plaintiff expressed concern with respect to how DrTango would be paid for preparing and delivering the Presentations to HEB and BCBS, since the payment was not covered by the Project PPA. JA 482-84, 486-87. The initial budget DrTango submitted for this additional work was $24,000. JA 453-54. After a series of negotiations, Merck staff negotiated the cost down to $8988.27. JA 455-56, 516. Because the PPA did not cover the cost of the Presentations and the invoice for the Project had been closed, the Merck team proposed paying DrTango pursuant to an addendum to the PPA. Def. R. Facts ¶ 54-55; JA 458-61, 635-67. Although the Plaintiff expressed to Mr. Giannetti that it was fair to pay DrTango for the work incurred in connection with the Presentations, JA 472-73, she voiced concerns that paying DrTango outside of a formal consulting agreement violated Merck policy. JA 478-80, 482-83. The Plaintiff testified in her deposition that she sought the advice of more experienced colleagues with respect to making the additional payment to DrTango, one of whom responded, "Jesus Christ, Joni, whatever you do, don't make those fucking payments, they will walk you out of here in handcuffs if this ever gets audited." SA 49. In his deposition, however, the colleague in question expressly denied having made these statements and stated that he did not believe that anything was wrong with making the payment. SA 138-40. Ultimately, DrTango was paid by Merck using a disbursement voucher, which was approved by Brian Cain, the Vice President of Merck's Market Research group. Def. R. Facts ¶ 60; JA 516-17, 519-49.

B.  Merck's Internal Investigation into the DrTango Study and Alleged Retaliation

In June 2010, the Plaintiff elevated her concerns to Merck's Business Practice & Compliance ("BP&C" or "Compliance") Division. Def. R. Facts ¶ 2; JA 257, 259-61. The Legal

and Human Resources personnel conducted an investigation (the "Investigation") into Plaintiff's concerns from June to August 2010. Def R. Facts ¶ 62-63; *see generally* JA 495-515, 550-77. During the Investigation, the Plaintiff expressed her concerns about the Market Research group's decision not to RFP the DrTango Project (JA 503-04, 510-11); the non-standard Project pricing (JA 503-05, 511-12); the Project's non-compliance with Merck's CPI guidelines (JA 505-06, 511); the delayed deadlines (JA 508-09); and the integrity of the positive deviance data (JA 508-09). During her Investigation interview, the Plaintiff claimed she told Mr. Giannetti that by creating an addendum to the PPA to pay DrTango for the Presentations, she felt Merck was engaging in "an inducement, a quid pro quo." JA 513. When asked during the Investigation if she believed the payments to DrTango for the Project or the Presentations bore any relationship to formulary decisions, the Plaintiff said she was "not sure," but noted that Dr. Schroeder had expressed that he had "great ties to BCBS" and its executives. JA 506-07.

The Plaintiff also asserted during the Investigation that she felt she was being retaliated against for expressing concerns about the Project. She cited examples of tense conversations with colleagues, including questions about the fact she was soon to go on maternity leave, which she perceived as attempts to intimidate her. JA 500, 573. The Plaintiff described numerous perceived "microinequities," such as a colleague's failure to reschedule a conference call, which she interpreted as a signal that her feedback was not welcome (JA 550); a scheduling issue related to a training session that "felt like a passive aggressive form of retaliation" (JA 502-03, 515); and an incident wherein Mr. Giannetti left an Award of Excellence on her desk instead of presenting it to her publicly, as he had agreed to do. JA 577. The Investigation, which concluded in August 2010, found that the Plaintiff's allegations of retaliation were not substantiated. JA 580-81. The Investigation did conclude, however, that the Plaintiff's supervisors—specifically, Mr. Giannetti

and Camelot Ives—"could show greater sensitivity and receptiveness" when employees voice

concerns about internal operations. JA 589.

      The Plaintiff went on maternity leave from August 2010 until February 2011. Def. R.

Facts ¶ 75, JA 263. Because the Investigation concluded shortly after the Plaintiff's maternity

leave began, the Investigation findings were delivered to her upon her return to work in February

2011. *Id.*; JA 261-62, 582. Defendant's Confidential Materials Submitted for In Camera Review

("In Camera Rev.") 246. In a meeting with Ellen Geisel, Senior Vice President of Operations (JA

262), the Plaintiff was advised that "[a]lthough there were several instances where proper

processes were not followed absolutely," the Investigation found that "there was no clear

violation of company policy." JA 590-91; In Camera Rev. 29. Further, the Investigation "did not

reveal any nefarious intent on any party's part, nor was there any impropriety in terms of seeking

to exert undue influence on formulary or contract decisions." JA 591. The Investigation did find

that there were "several instances where the Market Research Guideline Documents do not

appear to have been adhered to," JA 590, and determined that, "[b]ased on some of the gray

areas highlighted by this case, the Company is looking into potentially embedding the Market

Research guidelines in a more policy platform." JA 591.

      The parties do not dispute that following the delivery of the Investigation results, Mr.

Giannetti and Ms. Ives made significant efforts to ensure that Westawski felt comfortable and

professionally engaged in her position. Def. R. Facts ¶ 75; Pl. Facts at 10. In May 2011, Mr.

Giannetti sought out primary market research opportunities for the Plaintiff—a field in which she

felt she needed more experience. JA 105-06, 297-98, 596, 601. In June 2011, her managers gave

her approval to register for two Excel classes, at a value of $3,940. JA 603.  In August 2011, the

Plaintiff received an Award of Excellence for her work on another research project (JA 309) and,

based on her performance in 2011, she received an 8.59 percent bonus. JA 594. The Plaintiff

does not claim that she received a reduction in pay or a negative performance review for

speaking up about her concerns.  JA 274-75.

    C.  Plaintiff's Transfer and Termination

    Upon returning from leave in February 2011, the Plaintiff remained unhappy and

mistrustful in her working environment. Def. R. Facts ¶ 77; JA 272-74. Merck maintains that the

Plaintiff made multiple requests to be transferred and, in connection with a reorganization and

downsizing of Merck's Market Research group (JA 610-14), she was moved to a different unit

within the group in October 2011. Def. R. Facts ¶ 79; JA 32, 65, 273-74, 275-76. The Plaintiff

disputes this characterization of her transfer. She claims that, on returning from maternity leave,

she was unexpectedly moved to the new group, but had "no say" in where she was transferred.

Pl. Facts at 10; JA 275-76. Her new direct manager was Praveen Advani, who reported to Lisa

Courtade. Def. R. Facts ¶ 80; Pl. Facts at 10. The Plaintiff does not assert that her compensation

was affected by the transfer. *Id.*

    There was a limited exchange of information relating to the Plaintiff's performance in her

former position between Mr. Giannetti and her new supervisors. Def. R. Facts ¶ 81; Pl. Facts at

10-12. Mr. Advani and Ms. Courtade asked Mr. Giannetti and Ms. Ives to provide them with the

Plaintiff's personnel file, but they declined to do so. JA 10, 13-15; SA 59-62. Ms. Courtade

called Isabella Britton, the Human Resources Business Partner, who told her that they wanted "to

give [the Plaintiff] a fresh start"—to treat her "as a new employee." SA 61-63. According to

Merck, outside of these limited exchanges, neither Mr. Giannetti nor Ms. Ives spoke with either

Ms. Courtade or Mr. Advani about the Plaintiff, her performance, or the DrTango Project. Def.

R. Facts ¶ 80-82. However, Mr. Giannetti did provide Mr. Advani with the Plaintiff's 2011 year-

end review and compensation statement, since it was necessary for Mr. Advani to complete her performance evaluation in March 2012. Def. R. Facts ¶ 81; JA 6, 592-600. The Plaintiff's 2011 year-end review was generally positive, with some constructive criticism (JA 596-600), and situated her in the middle performance category relative to her peers (JA 595).

In the spring of 2012, Merck announced a company-wide initiative to decrease its worldwide workforce by 13 percent by 2015. JA 70-71, 611. The parties do not dispute that the downsizing involved several departments, including the Plaintiff's new department. Def. R. Facts ¶ 83; Pl. Facts at 11; JA 613, 627. Merck contends that the Market Research group was directed to eliminate eight positions across its divisions, and that the reorganization resulted in the elimination of the position held by the Plaintiff. Def. R. Facts ¶ 83; JA 317-19, 613-14.

In May 2012, approximately six months after the Plaintiff's transfer, Mr. Advani and Ms. Courtade were asked to assess their direct reports, including the Plaintiff, as part of the restructuring. JA 61-62, 71-72, 311. Mr. Advani assessed and provided scores for each of his employees in the relevant competencies, and discussed these scores with Ms. Courtade. JA 18-20, 75-76. The Plaintiff received a 1.86 average rating out of five—significantly lower than the two peer analysts against whom she was assessed. JA 86, 638-62, at rows 26-28 (Excel spreadsheet).

Merck asserts, and the Plaintiff does not dispute, that the Plaintiff's prior managers, Mr. Giannetti and Ms. Ives, had no input in her assessment. Def. R. Facts ¶ 87; JA 78-79, 139-40, 141-42. However, the Plaintiff contends that she received the lowest rating because she was assessed as a new employee. Pl. Facts at 12. She asserts that the assessors were instructed to consider data gathered from recent mid-year and end-year reviews. JA 312. Because Mr. Advani and Ms. Courtade were not provided with her personnel file, she argues, they did not have the

benefit of considering her positive reviews and awards in the assessment. Pl. Facts at 12; SA 64-65.

Merck terminated the Plaintiff's employment on June 25, 2012, JA 615-16, offering her a nine-month severance payment, which she declined. JA 277-78.

## III.   LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted). "[T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment].'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (emphasis in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.,* 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex,* 477 U.S. at 322-26; *Anderson*, 477 U.S. at 248-52). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe,* 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).

## IV.    DISCUSSION

### A. RETALIATION UNDER SECTION 806 OF SARBANES-OXLEY

#### (i)    Section 806 of the Sarbanes-Oxley Act

Section 806 of the Sarbanes–Oxley Act, 18 U.S.C. § 1514A, protects whistleblowing employees from retaliation for providing information about certain types of expressly enumerated activities. *See id*. § 1514A(a)(1)-(2). The statute provides, in relevant part:

(a) Whistleblower protection for employees of publicly traded companies.

No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)), including . . . any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or

in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—

. . .

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)[.]

*Id*. § 1514A(a)(1)(A)-(C).

The statute incorporates by reference the rules and procedures applicable to the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"). *See* 18 U.S.C. § 1514A(b)(2)(C) (citing 49 U.S.C. § 42121(b)). Pursuant to that incorporation, the Department of Labor has promulgated a regulation that applies AIR-21's two-part burden-shifting framework to Sarbanes-Oxley complaints. *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 329 (3d Cir. 2016) (*Wiest II*) (citing 29 C.F.R. § 1980.104(e)(2)-(4)).

Thus, to withstand Merck's motion for summary judgment, Plaintiff Westawski must identify evidence in the record from which a jury could determine that: (1) she "engaged in a protected activity"; (2) Merck "knew or suspected that [she] engaged in the protected activity"; (3) she "suffered an adverse action"; and (4) "the protected activity was a contributing factor in the adverse action alleged in the complaint." *Id*. (quoting 29 C.F.R. §1980.104(e)(2)(i)-(iv), 1980.104(a)). If the Plaintiff satisfies her burden to identify evidence to support all four elements, the burden then shifts to Merck to demonstrate "by clear and convincing evidence that [it] would have taken the same [adverse] action in the absence of [any protected activity]." *Id*.

(quoting 29 C.F.R. §1980.109(b)). Put differently, if a plaintiff establishes a prima facie case, a defendant can nevertheless prevail if it establishes, by clear and convincing evidence, that the putative protected activity was not a "but for" cause of the unfavorable personnel action. *See, e.g.*, *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 344-45 (4th Cir. 2014).

As to the first element of the prima facie case, protected activity under Section 806 covers the provision of information regarding conduct the employee "reasonably believes" constitutes a violation of 18 U.S.C.A. § 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of federal law relating to fraud against shareholders. *See* 18 U.S.C. § 1514A(a)(1).

The Sarbanes-Oxley Act does not define what constitutes a "reasonable belief." The Third Circuit has interpreted the "reasonable belief" standard to include both a subjective and an objective element. *Wiest v. Lynch*, 710 F.3d 121, 132 (3d Cir. 2013) (*Wiest I*) (cited with approval by *Wiest v. Tyco*, 812 F.2d 319, 326 (3d Cir. 2016) (*Wiest II*)).  Thus, the Plaintiff must establish not only a subjective, good faith belief that her employer violated a provision listed in Section 806, but also that her belief was objectively reasonable. *Wiest I*, 710 F.3d, at 132. The Third Circuit has explained that a belief is objectively reasonable "when a reasonable person with the same training and experience as the employee would believe that the conduct implicated in the employee's communication could rise to the level of a violation of one of the enumerated provisions in Section 806." *Id*.

The standard to be used in determining whether an employee's communication is protected has been a matter of some dispute. In 2006, the Administrative Review Board

("ARB")[1] established that "[f]or a communication to be protected, [the communication] must 'definitively and specifically' relate to any of the listed categories of fraud or securities violations" in 18 U.S.C. § 1514A. *Platone v. FLYi, Inc.*, ARB No. 04-154, 2006 WL 3246910, 2006 DOLSOX LEXIS 105 (Dep't of Labor Sept. 29, 2006) at *8. In 2011, the ARB changed course, concluding that *Platone*'s "definitively and specifically" test is inapposite to the Sarbanes-Oxley whistleblower protection provision. *Sylvester v. Parexel Int'l LLC*, ARB No. 07–123, 2011 WL 2165854, at *14-15 (ARB May 25, 2011) (en banc). In *Sylvester*, the ARB determined that "the critical focus is on whether the employee reported conduct that he or she *reasonably believes* constituted a violation of federal law . . . . and not whether that information "definitively and specifically" described one or more of [the] violations [listed in Section 806]." *Sylvester*, 2011 WL 2165854, at *15 (emphasis in original). In *Wiest I*, the Third Circuit concluded that the *Sylvester* standard was entitled to *Chevron* deference. *Wiest I*, 710 F.3d, at 130-31 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984)). The majority in *Wiest I* observed: "Moreover, whether an employee's communication is indeed "protected activity" under Section 806 is distinct from whether the employer had reason to suspect that the communication was protected. To show that the communication is protected, the employee must have both a subjective and an objective belief that the conduct that is the subject of the communication relates to an existing or prospective violation of one of the federal laws referenced in Section 806. The communication itself need not reveal all the facts that would cause a reasonable person with the whistleblower's training and background to conclude that a referenced federal law has been or will be violated.

---

[1] Congress delegated to the Secretary of Labor the adjudication of administrative claims brought under § 1514A. *See* 18 U.S.C. § 1514A(b). The Secretary, in turn, has delegated this power to the ARB. *See* Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 75 Fed. Reg. 3924, 3924 – 25 (Jan. 25, 2010). *See also* 29 C.F.R. § 1980.104 to 1980.110 (2011).

That determination should be based on all the attendant circumstances, and not be limited to the facts conveyed by a whistleblower to the employer." *Wiest I*, 710 F.3d, at 134.

As to the second prong of the prima facie case—that the employer knew or suspected that the plaintiff engaged in the alleged protected activity—the majority in *Wiest I* agreed with the dissent "that, in order for an employer to "know or suspect that the whistleblower-plaintiff is engaged in protected conduct . . . the plaintiff's intra-corporate communications must relate in an understandable way to one of the stated provisions of federal law in Section 806."" *Id*. at 134 (quoting Jordan, J., dissenting, at 139). "[T]he whistleblower's communication need not ring the bell on each element of one of the stated provisions of federal law to support an inference that the employer knew or suspected that the plaintiff was blowing the whistle on conduct that may fall within the ample reach of the anti-fraud laws listed in Section 806. To hold that an employer could not have suspected that the plaintiff was engaged in protected activity because the communication did not recite facts showing an objectively reasonable belief in the satisfaction of *each element* of one of the listed anti-fraud provisions would eviscerate Section 806. An employee may not have access to information necessary to form a judgment on certain elements of a generic fraud claim, such as scienter or materiality, and yet have knowledge of facts sufficient to alert the employer to fraudulent conduct." *Id*. at 134 (emphasis added).

Thus, pursuant to *Wiest I*, "an employee must have an objectively reasonable belief of a violation of one of the listed federal laws, but need not have a reasonable belief that each element of a listed anti-fraud law is satisfied." *Id*. at 132. Put differently, a Sarbanes-Oxley whistleblower plaintiff can state that she had a reasonable belief that her employer violated Section 806 without specifically alleging that she believed that the employer's conduct satisfied all the elements of the suspected violation. Therefore, although a mistaken belief that an employer engaged in

19

conduct that constitutes a violation of one of the six enumerated categories set forth in Section 806 may be protected, it will only be protected if the subjective, mistaken belief is reasonable. *See id.* (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009)). *See also Harp v. Charter Comm'ns, Inc.*, 558 F.3d 722, 725 (7th Cir. 2009).

In *Wiest I*, the Third Circuit applied *Sylvester*'s reasonable belief standard in the context of a motion to dismiss. Application of this standard in the context of a summary judgment motion, as is the case here, requires the Plaintiff to identify in the record competent evidence from which a jury could conclude that her communications regarding the DrTango study constituted protected activity. *See Wiest II* at 329. In sum, pursuant to *Wiest I* and *II*, Plaintiff Westawski is required to point to record evidence that, at the time of her intra-corporate communications, she had both a subjective and an objectively reasonable belief that the conduct she complained of related to an existing or prospective violation of the federal laws referenced in Section 806.

(ii)     Merck's motion for summary judgment

Merck argues that it is entitled to summary judgment on the Plaintiff's Sarbanes-Oxley claim for three reasons.

First, Merck contends that the Plaintiff has not identified any record evidence from which a jury could conclude that she engaged in protected activity. *See* Defendant's Motion for Summary Judgment ("Mtn.") at 9-20. More specifically, Merck argues that none of the concerns the Plaintiff raised during her employment relate in an understandable way to violations of one of the enumerated laws covered by Sarbanes-Oxley, namely mail fraud, bank fraud, securities fraud, violation of an SEC rule or regulation, or violation of a federal law relating to shareholder fraud. Mtn. at 10-15. Merck further argues that the Plaintiff did not subjectively believe that any

aspect of the DrTango project violated the law or defrauded shareholders, Mtn. at 15-17, and that the Plaintiff's alleged belief that the DrTango project was fraudulent or illegal is not objectively reasonable. Mtn. at 17-20.

Second, Merck argues that the Plaintiff has adduced no evidence that her complaints regarding the DrTango project contributed to her termination. Mtn. at 20-24.

Finally, in the alternative, Merck argues that it would have eliminated the Plaintiff's position even in the absence of the alleged protected activity. Mtn. at 25-26.

The Plaintiff responds that the policy violations she witnessed over the course of the DrTango project led her to communicate a subjective and objectively reasonable belief that Merck was engaging in a violation of one of the federal laws referenced in Section 806. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem.") at 31-33. Specifically, she points to the decision not to use the RFP process when retaining DrTango, Pl. Mem. at 13; the high cost of the research, non-compliance with Merck's CPI guidelines, and Mr. Giannetti's suggestion that DrTango increase the number of interviews to conform with the CPI policy, Pl. Mem. at 13-15; the poor quality of the research findings and final report, Pl. Mem. at 15-18; the fact that the Merck accounts team was in contact with DrTango while the Study was underway, Pl. Mem. at 18-19; and the method by which Merck paid DrTango an additional sum to present the research findings to HEB and BCBS, Pl. Mem. at 19-21.

The Plaintiff asserts that, taken together, this series of irregularities led her to believe that she was being asked to facilitate a bribe. Pl. Mem. at 12, 20, 28. Specifically, she contends that the goal of the project was not to produce a scientifically valid research study, but to leverage DrTango's personal relationships at BCBS of Texas. Pl. Mem. at 7, 10. The Plaintiff argues that

she not only harbored a subjective belief that a Sarbanes-Oxley violation was occurring, but that she brought her concerns to the attention of her supervisor, Mr. Giannetti, and ultimately elevated them to BP&C. Pl. Mem. at 12, 20. Finally, the Plaintiff asserts that Merck had knowledge of her alleged protected activity, Pl. Mem. at 33-34; and that her communications about the Project were a contributing factor in her termination. Pl. Mem. at 34-36.

    1.   Protected activity

    This case turns on whether a jury could find that the Plaintiff engaged in protected activity under Section 806 Sarbanes-Oxley. At oral argument on the instant motion, Plaintiff conceded that no reasonable person in her position would have believed that the facts known to her amounted to bank fraud or securities fraud. Accordingly, with respect to the first prong of her prima facie case, the Plaintiff argues only that she had a reasonable belief that the Defendant was engaging in activity that amounted to mail fraud, wire fraud, or shareholder fraud. Each of these arguments are addressed in turn.

    (a)   Mail fraud

    The Plaintiff has not identified competent evidence from which a jury could conclude that, at the time of her communications regarding the DrTango study, she had an objectively reasonable belief that the conduct she complained of related to an existing or prospective mail fraud violation. The federal mail fraud statute, 18 U.S.C. § 1341, provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . knowingly causes to be delivered by mail . . . any . . . matter or thing, shall be fined . . . .
> *Id*. § 1341.

    "To prove mail . . . fraud, the evidence must establish beyond a reasonable doubt[:] (1) the defendant's knowing and willful participation in a scheme or artifice to defraud[;] (2) with

the specific intent to defraud[;] and (3) the use of the mails . . . in furtherance of the scheme."

*United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001) (citing *United States v. Clapps*, 732

F.2d 1148, 1152 (3d Cir. 1984)). Although the Plaintiff need not have an objectively reasonable

belief that *each element* of a listed anti-fraud law is satisfied, *Wiest I* at 132, she must have an

objectively reasonable belief of a violation of one of the listed federal laws. *Id*.

  The Plaintiff falls short of establishing that a reasonable person with her training and

experience would believe that the undisputed problems with the DrTango Study could rise to the

level of mail fraud. As provided in Section 1341, mail fraud requires a scheme to obtain money

or property by fraudulent pretenses. The Plaintiff has not alleged such a scheme. She points to

perceived policy violations, operational irregularities, and correspondence between DrTango and

the Merck accounts team as evidence for a "kickback" whereby Merck funded a bogus study in

exchange for access to BCBS and HEB executives, but identifies no prohibition on

pharmaceutical companies networking with employers and health plan providers such as HEB

and BCBS. To the contrary, the record suggests that this is common industry practice. According

to the record evidence, both BCBS and HEB were genuinely interested in the results of the

DrTango study. SA 98-99. HEB wanted to know how to better engage their employees in their

healthcare, while BCBS wanted to retain HEB as a key client. *Id*. Merck, for its part, saw an

alignment of interests with BCBS and HEB in the Study: by increasing adherence to wellness

programs and improving the quality of healthcare in the medical categories in which Merck

participates, Merck would "get [its] fair share of business." *Id*. at 98. Likewise, Mr. Giannetti

explained to the Merck Human Resources and Legal department staff who interviewed him as

part of the 2010 Investigation that although Merck does not pay for relationships with employers

and healthcare providers, "[b]etter relationships with HEB [and] BCBS were ancillary benefits"

of the DrTango Project. JA 554. This characterization of the Project's objectives was echoed by

Dee Parke, who testified in her deposition that pharmaceutical companies, including Merck,

routinely engage in disease management projects that seek to help large, self-funded employers

improve the health of their employee population, thereby controlling healthcare costs. JA 145-

46. Parke testified that all pharmaceutical companies offer these services. JA 145. According to

both Ms. Parke and Mr. Counihan's testimony, the goal of adherence projects like the DrTango

Study is not to increase sales *per se*, but to create wellness, which in turn produces a general

increase in consumption of healthcare services and pharmaceutical products. JA 56, 145-46.  Ms.

Parke observed that Merck had no means of determining whether adherence projects such as the

DrTango Study had any impact on sales of its products regionally, nationally, or otherwise. JA

151. Indeed, the Plaintiff conceded in her deposition that the DrTango project was an unbranded

study; that is to say, it contained no reference to Merck's products or the efficacy of those

products. JA 292.

  The Plaintiff suggests that even if her belief that the DrTango Project fraudulent activity

was mistaken, it was nevertheless reasonable. She contends that her peers expressed concerns

with respect to the Project, but has not produced any evidence to that effect other than her own

testimony. The Plaintiff stated in her deposition that she sought the advice of colleagues with

respect to whether she should authorize the additional payment for DrTango's presentations to

HEB and BCBS. SA 49. She alleges that one such colleague, Jim Adair, warned her not to

"make those fucking payments" because "they will walk you out of here in handcuffs if this ever

gets audited." SA 49. In Mr. Adair's deposition, however, he expressly denied having made

those statements and stated that he did not believe that anything was wrong with making the

additional payment. SA 138-40. In light of the other record evidence, the Plaintiff cannot rely on

her self-serving deposition testimony to defeat Merck's motion for summary judgment. *See Irving v. Chester Water Authority*, 439 Fed.Appx. 125, 127 (3d Cir. 2011) ("In light of both his earlier testimony and other record evidence, [plaintiff's] self-serving deposition testimony is insufficient to raise a genuine issue of material fact.").

The Plaintiff has not adduced any evidence that the issues associated with the DrTango Study would lead a reasonable person with her training and experience to believe that mail fraud was occurring or on the verge of taking place. With respect to mail fraud, therefore, the Court finds that even if the Plaintiff held a subjective belief that such a violation was occurring or on the verge of taking place, that belief was not objectively reasonable.

(b) Wire fraud

The Court reaches the same conclusion with respect to wire fraud. The federal wire fraud statute, 18 U.S.C. § 1343, provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . .

*Id*. § 1343.

The elements of wire fraud parallel those of mail fraud, but require the use of an interstate electronic communication or telephone call made in furtherance of the fraudulent scheme. "To prove . . . wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001) (citing *United States v. Clapps*, 732 F.2d 1148, 1152 (3d Cir. 1984)).

25

The Plaintiff has not produced competent evidence from which a jury could conclude that, at the time of her communications regarding the DrTango study, she had an objectively reasonable belief that the complained-of conduct related to an existing or prospective wire fraud violation. The evidentiary record does not include anything to justify a reasonable belief by a person with the Plaintiff's training and experience that Merck was using interstate wires to obtain money or property by fraudulent pretenses. Certainly, Merck used interstate wires in furtherance of the DrTango Project. As noted *supra*, however, to the extent the Plaintiff argues that Merck was acting fraudulently by using DrTango to gain access to BCBS executives, the Plaintiff betrays a misunderstanding of industry practice. The record evidence makes clear that Merck and other pharmaceutical companies view fostering relationships with customers as critical to their business development. JA 42-43, 56, 145-46; SA 98-99. Thus, even if the Plaintiff had a subjective belief that Merck's conduct constituted wire fraud, such a belief was not objectively reasonable and it is not protected under the Act.

      (c)  Shareholder fraud

Finally, the Plaintiff has not adduced evidence from which a jury could conclude that a reasonable person in her position could have believed that the facts known to her at the time of her complaints amounted to shareholder fraud. Among the federal laws and regulations enumerated in Section 806 Sarbanes-Oxley is "any provision of Federal law relating to fraud against shareholders [.]" § 1514A(a)(1). The specific shareholder fraud contemplated by Section 806 is that in which a public company—either acting on its own or through its contractors— makes material misrepresentations about its financial picture in order to deceive its shareholders. *Gibney v. Evolution Mktg. Research, LLC*, 25 F.Supp.3d 741, 748 (E.D. Pa. 2014) (citing *Harvey v. Safeway*, 2005 WL 4889073, at *3 (Dept. of Labor Feb. 11, 2005) ("Nothing in the text of §

1514A or the *Lawson* decision suggests that SOX was intended to encompass *every* situation in which any party takes an action that has some attenuated, negative effect on the revenue of a publicly-traded company, and by extension decreases the value of a shareholder's investment . . . extending SOX's protections in this way presents obvious "overbreadth" concerns that risk "mak[ing] SOX a general anti-retaliation statute applicable to any private company that does business with a public company.")).[2]

As the Defendant correctly notes, it was not reasonable for the Plaintiff to believe that the DrTango Project had a material effect on Merck's financial statements. Even if Merck lost money on the Project, the Study cost Merck just over $200,000, or 0.000004% of its sales revenue in 2010. JA 200-01, 204. Considering Merck's revenue stream, it cannot be said that such a small amount meets the materiality requirement for an objectively reasonable belief in shareholder fraud. *See, e.g.*, *Beacom v. Oracle America, Inc.*, 825 F.3d 376 (8th Cir. 2016) (affirming grant of summary judgment for the defendant, finding the employee's belief that the defendant corporation was defrauding investors to be objectively unreasonable where the corporation—which generated billions of dollars annually—missed its projections by a "minor discrepancy" of "no more than$10 million."); *Day v. Staples*, 555 F.3d 42 (1st Cir. 2008) (affirming summary judgment for the defendant, holding that the plaintiff failed to demonstrate that any of the alleged manipulations of accounting data were material to shareholders); *Livingston v. Wyeth*, 520 F.3d 344 (4th Cir. 2008) (affirming summary judgment for the defendant, finding that, where the defendant had over two dozen facilities with over $14 billion in revenue, the plaintiff failed to demonstrate that the alleged misconduct would be material to

---

[2] *See also Safarian v. Am. D.G. Energy, Inc.*, No. 10–6082, 2014 WL 1744989, at *5 (D.N.J. Apr. 29, 2014) ("[A]pplying the Sarbanes-Oxley Act to any fraudulent actions that might lead to misstatements in the accounting records or tax submissions would unduly expand the Act to a general anti-retaliation statute."), *aff'd in relevant part*, *vacated in part remanded*, 622 Fed.Appx. 149 (3d Cir. 2015).

defendant's shareholders). Even if the Plaintiff subjectively believed that the issues associated with the DrTango Project somehow amounted to shareholder fraud, such a belief was not objectively reasonable as a matter of law.

## V. CONCLUSION

The Court finds that, on the undisputed facts, no reasonable juror could conclude that a reasonable person in the Plaintiff's position could have believed that the facts known to the Plaintiff amounted to a violation of one of the federal laws or regulations set forth in Section 806. Because the Plaintiff has failed to establish that she engaged in protected activity, she cannot succeed in her Sarbanes-Oxley challenge. As a result, there is no need to determine whether the Plaintiff has met the remaining elements for a prima facie case under Section 806, or whether Defendant has proved by clear and convincing evidence that Plaintiff would have been discharged notwithstanding her complaints. Summary judgment in favor of Defendant shall therefore be granted.

An appropriate Order follows.

Dated: **October 17, 2016**

**BY THE COURT:**

/S/WENDY BEETLESTONE, J.

_____

**WENDY BEETLESTONE, J.**